Grafton
No. 2006-236

JOY A. CHASE

v.

AMERIQUEST MORTGAGE COMPANY

Argued: January 5, 2007
Opinion Issued: February 21, 2007

*Gregory M. Sorg*, of Franconia, on the brief and orally, for the plaintiff.

*McNicholas Law Offices, P.A.*, of Concord (*Patrick J. McNicholas* on the brief and orally), for the defendant.

DUGGAN, J. The plaintiff, Joy A. Chase, appeals an order of the Trial Court (*Burling*, J.) requiring her to pay a portion of an outstanding mortgage held by the defendant, Ameriquest Mortgage Company (Ameriquest). We affirm.

*I. Background*

The facts are undisputed. The plaintiff and her ex-husband, George Chase, purchased a home at 55 Main Street in Rumney in August 1996. Using their home as collateral, they later executed a mortgage note and deed with Bankers Trust Company of California. In April 2002, again utilizing the home as collateral, Mr. Chase entered into a mortgage with Ameriquest in the amount of $90,000. The parties stipulated, for purposes of the hearing before the trial court, that Mr. Chase forged the plaintiff's name when he executed the mortgage instrument with Ameriquest. As part of the mortgage agreement, Ameriquest paid off the Bankers Trust mortgage.

Pursuant to a divorce agreement later executed between the plaintiff and her husband, the plaintiff became the "sole owner of the parties' marital residence subject to any indebtedness legally secured thereby." At some point, the plaintiff did not meet the obligations of the mortgage with

Ameriquest and foreclosure proceedings began. The plaintiff then sought to enjoin the foreclosure. The proceedings at issue here followed, with Ameriquest seeking $74,439.78 from the plaintiff, the amount it paid to Bankers Trust.

After a hearing, the trial court ruled that Ameriquest's mortgage constituted a charge on the homestead and the doctrines of equitable subrogation and unjust enrichment required the plaintiff to pay the $74,439.78. The plaintiff appealed, arguing that the trial court erred in applying the doctrines of equitable subrogation and unjust enrichment because the statutory homestead exemption relieves her from any obligation to pay Ameriquest under the terms of the mortgage.

*II. Statutory Homestead Exemption*

We begin with the interpretation and application of the statutory homestead exemption as set forth in RSA 480:1, :4 and :5-a. The interpretation and application of statutes present questions of law, which we review *de novo. See, e.g., Town of Hinsdale v. Town of Chesterfield,* 153 N.H. 70, 72 (2005). In conducting our review, we accord deference to the trial court's findings of historical fact, where those findings are supported by evidence in the record. *Elwood v. Bolte,* 119 N.H. 508, 510 (1979).

RSA 480:1 (Supp. 2006) establishes the homestead right by providing that "[e]very person is entitled to $100,000 worth of his or her homestead, or of his or her interest therein, as a homestead." The plaintiff argues that RSA 480:1 generally protects her, up to $100,000, from having to make payment on the mortgage with Ameriquest. Neither side disputes that the plaintiff's house constitutes a homestead within the meaning of RSA 480:1. Thus, we assume for purposes of our analysis the correctness of that position. However, the trial court held that the homestead right in RSA 480:1 did not apply in the plaintiff's case because the Ameriquest mortgage fell within the exception contained in RSA 480:4, III (2001), which provides:

> The homestead right is exempt from attachment during its continuance from levy or sale on execution, and from liability to be encumbered or taken for the payment of debts, except in the following cases:
>
> . . .
>
> III. In the enforcement of mortgages which are made a charge thereon according to law . . . .

The trial court ruled that RSA 480:4, III applied because Ameriquest discharged the Bankers Trust mortgage, and thereby became entitled to treat the Bankers Trust mortgage as if it were a charge on the homestead

that had been assigned to Ameriquest. The plaintiff contends that RSA 480:4, III does not apply because the Ameriquest mortgage is not a charge on the homestead "according to law" since it was not created with the formalities required by either RSA 477:3 (2001) or RSA 480:5-a (2001). We agree with the plaintiff.

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Town of Hinsdale*, 153 N.H. at 72. When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Appeal of Town of Bethlehem*, 154 N.H. 314, 319 (2006). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme. *Soraghan v. Mt. Cranmore Ski Resort*, 152 N.H. 399, 405 (2005). When interpreting two or more statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes. *Id.*

RSA 480:4, III requires: (1) a mortgage; (2) which is made a charge on a homestead; (3) according to law. Even if we assume *arguendo* that the first two requirements are satisfied, the third is not. The Ameriquest mortgage does not satisfy the requirements of at least two applicable statutes.

First, the Ameriquest mortgage does not satisfy the requirement of RSA 477:3 that "[e]very deed or other conveyance of real estate shall be signed by the party granting the same and acknowledged by the grantor before a justice, notary public or commissioner and shall show the mailing address of the grantee." Although the Ameriquest mortgage constitutes a conveyance of real estate, *see* BLACK'S LAW DICTIONARY 1031 (8th ed. 1999) (defining mortgage), the party (or parties) granting the conveyance at issue here did not sign and acknowledge it before a justice, notary public or commissioner. *See* RSA 477:3. That is, the trial court found that both the petitioner and her husband owned the home; they were thus the parties who could grant the conveyance. However, for purposes of this case, both parties stipulated that the plaintiff's husband forged her name on the mortgage instrument. Accordingly, the statutory formalities of execution were not satisfied.

Second, the Ameriquest mortgage does not satisfy the requirements of RSA 480:5-a. It dictates that "[n]o deed shall convey or encumber the homestead right, except a mortgage made at the time of purchase to secure payment of the purchase money, unless it is executed by the owner

and wife or husband, if any, with the formalities required for the conveyance of land." There can be no dispute that the Ameriquest mortgage was not "a mortgage made at the time of purchase to secure payment of the purchase money." Nor, given our discussion of RSA 477:3, can there be any dispute that the Ameriquest mortgage was not "executed by the owner and wife or husband, if any, with the formalities required for the conveyance of land." *See* RSA 480:5-a; *see also In re St. Onge*, 317 B.R. 39, 42 (Bankr. D.N.H. 2004) (explaining that homestead exemption can be waived where husband and wife both execute mortgage deed with formalities required by law). Accordingly, the Ameriquest mortgage cannot constitute a charge on the homestead according to law because at least two crucial provisions of the law were not followed. Thus, we conclude that RSA 480:4, III does not apply, and the trial court erred by ruling to the contrary.

*III. Equitable Subrogation*

Although the language of the statutory homestead exemption supports the plaintiff's position, we decline her invitation to end our analysis here. The plaintiff is in the somewhat unenviable position of having invoked the superior court's equitable powers to enjoin the foreclosure, but then arguing that the court erred in exercising those same powers to balance the equities and exigencies of this particular case. We are mindful of the trial court's observation that, despite the forgery, "[a] benefit was conferred on Ms. Chase when Ameriquest paid her valid mortgage. Ms. Chase is aware of the benefit because she took out the original mortgage and lives on the property. It is inequitable for Ms. Chase to retain the property free and clear of all liens." As the Florida Supreme Court noted in a case quite similar to this one, "The homestead exemption is intended to be a shield, not a sword." *Palm Beach Sav. & Loan v. Fishbein*, 619 So. 2d 267, 271 (Fla. 1993). Accordingly, we now consider whether to uphold the trial court's exercise of its equitable powers.

RSA 498:1 (1997) (amended 2006) confers equitable jurisdiction upon the superior court in several types of cases, including those dealing with fraud and mortgage foreclosure. The plaintiff initiated this case in equity to enjoin a mortgage foreclosure and she stipulated to the existence of forgery. *See Owen v. Stewart*, 111 N.H. 350, 352 (1971) ("Plaintiff's petition alleged fraud and the power of the superior court to exercise its equitable jurisdiction in the case of fraud has long been recognized."). Although it was not the plaintiff herself who perpetrated the forgery, "the superior court's equitable jurisdiction extends to granting relief from the effects of another person's fraud when the party wronged seeks other than damages . . . ." *Fisher v. Koper*, 127 N.H. 330, 336, (1985).

[2] "[I]t is the historic purpose of equity to secure complete justice . . . ." *N.H. Donuts, Inc. v. Skipitaris*, 129 N.H. 774, 783 (1987) (quotation omitted).

> The court has broad and flexible equitable powers which allow it to shape and adjust the precise relief to the requirements of the particular situation. A court of equity will order to be done that which in fairness and good conscience ought to be or should have been done. It is the practice of courts of equity, having jurisdiction, to administer all relief which the nature of the case and facts demand.

*Claremont School Dist. v. Governor (Costs and Attorney's Fees)*, 144 N.H. 590, 594 (1999) (quotations, citations and brackets omitted). The propriety of awarding equitable relief rests in the sound discretion of the trial court to be exercised according to the circumstances and exigencies of the case. *Gutbier v. Hannaford Bros. Co.*, 150 N.H. 540, 541 (2004). We will uphold a trial court's equitable order unless it constitutes an unsustainable exercise of discretion. *Id.* at 541-42.

The Florida Supreme Court dealt with similar facts and issues in *Palm Beach Savings and Loan v. Fishbein. See Fishbein*, 619 So. 2d at 267. There, Mr. Fishbein took title to a house in Palm Beach in his own name, assumed an existing mortgage on the house, and executed a purchase money mortgage. *Id.* at 268. Later, both Mr. Fishbein and his wife executed a second mortgage on the Palm Beach house, acknowledged the existence of the previous mortgages, and then lived in the house for several years. *Id.* Approximately three years after the second mortgage was executed, Mr. Fishbein took out yet another mortgage, again using the Palm Beach house as collateral. *Id.* This time the mortgage was for $1,200,000 and he obtained it by forging Mrs. Fishbein's name on the mortgage instrument. *Id.*

As part of a subsequent divorce proceeding, Mr. Fishbein executed a quitclaim deed, granting Mrs. Fishbein title to the house and representing that it was free and clear of liens. *Id.* The mortgage (obtained via the forgery) then went into default and the bank commenced foreclosure proceedings, which Mrs. Fishbein challenged. *Id.* at 269.

As a result of Mrs. Fishbein's challenge, the trial court ruled that the bank could not foreclose on the mortgage, but that it could have an equitable lien on the house to the extent that its funds were used to satisfy the preexisting mortgages and taxes. *Id.* The trial court also stayed any foreclosure sale on the equitable lien so that Mrs. Fishbein could have an opportunity to try to sell the home privately. *Id.* An intermediate appellate court affirmed the trial court's conclusion that the house was Mrs.

Fishbein's homestead, and as such not subject to foreclosure by the bank, but reversed the imposition of the equitable lien, reasoning that such a lien could "only be imposed against homestead real property where the beneficiary of the homestead protection is guilty of fraudulent or otherwise egregious conduct." *Id.*

The Florida Supreme Court reversed the intermediate court, holding that despite the forgery, equity would not allow Mrs. Fishbein to use the homestead exemption to receive a "windfall." *Id.* at 270-71. The court acknowledged the section of the Florida Constitution that creates a homestead exemption:

> There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person: (1) a homestead . . . .

*Id.* at 269. The court reasoned, however, that under imposition of an equitable lien,

> Mrs. Fishbein [stood] in no worse position than she stood before the execution of the mortgage. When the bank made its loan, one of the prior mortgages was already overdue. Mr. Fishbein testified that by that time he had no other assets which could be used to pay off the preexisting liens, and Mrs. Fishbein testified that she had no funds with which to pay them. Of course, Mrs. Fishbein should not be made to suffer because the bank was not more careful in ensuring that her signature on the mortgage was genuine. This is why the bank can make no claim against the property for the [money] not used to benefit the homestead. On the other hand, Mrs. Fishbein is not entitled to a . . . windfall. The homestead exemption is intended to be a shield, not a sword.

*Id.* at 270-71.

Relying upon *Havoco of America, Ltd. v. Hill*, 790 So. 2d 1018 (Fla. 2001), the plaintiff argues that *Fishbein* is not persuasive because it has essentially been narrowed to an "anomalous" holding by subsequent decisions of the Florida Supreme Court. According to the plaintiff, *Havoco* and related cases stand for the proposition that in order "to impose an equitable lien on the homestead right, the case must involve situations that fall within one of the three stated exceptions to the Florida [C]onstitution's homestead right"—and apparently fraud or forgery in the procurement of

a mortgage, alone, is not one of them. We do not share the plaintiff's reading of *Havoco*. The *Havoco* court discussed *Fishbein* and related cases in great detail, *see id.* at 1024-28, and ultimately reaffirmed the holding in *Fishbein* that the court will "invoke[] equitable principles *to reach beyond the literal language of the exceptions* only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." *Id.* at 1028 (emphasis added). Just such fraud and egregious conduct are at issue here, where it has been stipulated that the plaintiff's husband used forgery to obtain funds from Ameriquest to pay off the existing Bankers Trust mortgage and thereby invest in the homestead.

Thus, given the close factual similarities between the present appeal and the *Fishbein* case, and in light of the broad equitable powers that rest with the superior court in this state, we are persuaded that the Florida Supreme Court's decision to apply principles of equity struck the proper balance between the purpose of the homestead exemption and the circumstances or exigencies of the case. *Cf. Skipitaris*, 129 N.H. at 783 ("[A] court sitting in equity may even devise a remedy which extends or exceeds the terms of a prior agreement between the parties, if it is necessary to make the injured party whole." (quotation omitted)). Accordingly, we conclude that equitable principles should be applied here; therefore, we must decide whether the trial court properly applied the doctrine of equitable subrogation.

Generally,

> the doctrine of subrogation has its origins in equity. A party's right to subrogation can arise either by contract, statute, or common law or equitable principles. The doctrine of subrogation presupposes the payment of a debt by a party secondarily liable therefor, who thereby acquires an equitable right to be reimbursed by the principal debtor and for the purpose of making this right effective is invested with all the rights which the creditor had against him (the principal debtor). The purpose behind subrogation is to place the responsibility where it ultimately should rest by compelling payment by the one who in good conscience ought to pay it. It also prevents [individuals] from recouping a windfall .... In any subrogation case, the burden of proving entitlement is on the subrogee, which generally includes proof of: the existence and applicability of equitable principles or contractual provisions as to subrogation and reimbursement.

*Wolters v. Am. Republic Ins. Co.*, 149 N.H. 599, 601 (2003) (quotations, citations and brackets omitted). Claims for subrogation are generally made against a wrongdoer, but need not necessarily be limited to such an individual. 73 AM. JUR. 2D *Subrogation* § 2 (2001).

▮ Equitable subrogation, in particular, is a broad doctrine, which is given liberal application. *Id.* § 5. "It applies where one who has discharged the debt of another may, under certain circumstances, succeed to the rights and position of the satisfied creditor." *Id.* In order for equitable subrogation to apply, we hold that all of the following conditions must be met: (1) the subrogee cannot have acted as a volunteer; (2) the subrogee must have paid a debt upon which it was not primarily liable; (3) the subrogee must have paid the entire debt; and (4) subrogation may not work any injustice to the rights of others. *See id.* Although the trial court held that equitable subrogation required satisfaction of a fifth element, namely, that payment by the subrogee have been made to protect its own interest, we conclude that the definition of "volunteer," set forth below, adequately takes this consideration into account. Therefore, inclusion of this fifth element in the test for equitable subrogation is unnecessary.

▮ With respect to the first element, the question is whether Ameriquest acted as a volunteer in paying off the Bankers Trust mortgage. For purposes of equitable subrogation, "one is a volunteer if he pays while under no obligation to pay or when no interest of his is protected by payment." *Norfolk & Dedham Fire Ins. Co. v. Aetna Cas. & Sur. Co.*, 318 A.2d 659, 661 (Vt. 1974); *accord Rawson v. City of Omaha*, 322 N.W.2d 381, 384-85 (Neb. 1982) ("[O]ne who pays the debt of another in order to protect his own property or interest is not considered a volunteer for purposes of equitable subrogation."). Here, Ameriquest paid the Bankers Trust mortgage in order to protect its interest in the homestead as collateral to secure the debt. As the trial court held, by paying off the mortgage note to Bankers Trust, "Ameriquest became the primary note holder on the property at 55 Main Street. Ameriquest secured the sole right of foreclosure on the property, which operated as collateral in the event Mr. and Ms. Chase did not meet the terms in the Security Instrument." Accordingly, the first factor is satisfied.

As the trial court properly noted, the next two "elements are not in dispute. The debt paid was not one that Ameriquest was primarily liable on and the entire debt owed by Mr. and Ms. Chase to Bankers [T]rust was paid."

▮ The fourth element is likewise satisfied. The trial court found both that the plaintiff and her husband executed the Bankers Trust mortgage in

the amount of $71,300 and that some payments thereon had not been made, resulting in the total amount of the debt increasing to $74,439.78. Neither side challenged these findings. Further, although Ameriquest was allegedly negligent in failing to uncover the forgery, we have held that negligence on the part of a surety does not invalidate the right to subrogate. *Fifield v. Mayer*, 79 N.H. 82, 85 (1918). Accordingly, we discern nothing unjust about allowing Ameriquest to obtain relief for the $74,439.78 because that is the amount for which the plaintiff would have been liable under the Bankers Trust mortgage. To hold otherwise would potentially yield a windfall for the plaintiff and could encourage collusive deception against lenders.

We acknowledge that Ameriquest issued a mortgage in the amount of $90,000; however, the plaintiff should not be made to bear an increased financial burden because Ameriquest was not vigilant in making certain that all of the signatures on the mortgage instrument complied with the requirements of RSA 477:3 and RSA 480:5-a. The amount recoverable by operation of equitable subrogation is limited by the "general rule . . . that a subrogee is entitled to indemnity to the extent only of the money actually paid by him to discharge the obligation, or the value of the property applied for that purpose." 73 AM. JUR. 2D *Subrogation* § 67. Therefore, we agree with the trial court that Ameriquest is not entitled to recover the difference between the amount outstanding on the Bankers Trust mortgage and the amount it ultimately lent.

*IV. Conclusion*

Accordingly, for the foregoing reasons, we disagree with the trial court's conclusion concerning the applicability of RSA 480:4, III, but uphold its application of the doctrine of equitable subrogation under the facts of this case. Having upheld the trial court's application of equitable subrogation, we need not reach arguments concerning its application of the doctrine of unjust enrichment.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.